**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 2, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

ROBERT MCBRIDE,

      Plaintiff - Appellee,

v.

MARKET STREET MORTGAGE, a
Florida corporation,

      Defendant - Appellant.

No. 07-8044
(D. Wyo.)
(D.C. No. 2:06-CV-00057-ABJ)

**ORDER AND JUDGMENT**[*]

Before **HENRY**, **O'BRIEN**, and **TYMKOVICH**, Circuit Judges.

Robert McBride entered into a three-year Employment Agreement with Market
Street Mortgage Company (Market Street) in which it agreed to pay him $230,000 in
Annual Base Salary. Approximately seven months into the Agreement, Market Street
sent McBride a letter informing him his salary was being reduced to $85,000. Believing
he had suffered a "reduction by the Company in [his] Annual Base Salary" which would
allow him to terminate the Agreement for cause, McBride gave notice and sought

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th
Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1.
It is appropriate as it relates to law of the case, issue preclusion and claim preclusion.
Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A).
Citation to an order and judgment must be accompanied by an appropriate parenthetical
notation – (unpublished). *Id.*

"Termination Payments" under the Agreement. Claiming the letter was a mistake, Market Street refused to remit the "Termination Payments." McBride sued. The critical issue is whether the letter constituted "a reduction by the Company in [McBride's] Annual Base Salary." McBride claimed it did; Market Street argued it did not because McBride never received a paycheck at the reduced level. The district court submitted the issue to a jury which found in favor of McBride. It awarded $894,000 in total damages—$242,000 on McBride's termination for cause claim and an additional $652,000 in damages for breach of the Agreement. The court also entered a declaratory judgment relieving McBride of his contractual obligations not to compete with Market Street.

Market Street appeals from the jury's verdicts and the declaratory judgment. We affirm the jury's liability verdicts and the declaratory relief but reverse the damages awards and remand for further proceedings.

## I.    FACTUAL BACKGROUND

A.    Market Street's Purchase of Major Mortgage

In 1995, WERCS, a Wyoming company, approached McBride about starting a mortgage banking company on its behalf. McBride agreed and started Major Mortgage in 1996. Eight years later, WERCS decided to sell Major Mortgage, which at that time had thirty-five offices in ten states and was originating $800 million in loans annually.

Market Street submitted a letter of intent to purchase Major Mortgage, which also offered employment to Major Mortgage's existing management team—McBride, Terry Mott, Kip Clark, Steve Carver and Julie Zeiler. Market Street agreed to pay a total of $1.5 million in bonuses to these individuals within the first year of the acquisition.

WERCS sold Major Mortgage to Market Street in July 2005.

B.        The Employment Agreement

On July 9, 2005, Market Street entered into a three-year Employment Agreement[1] with McBride under which he would serve as Market Street's Western Division manager.[2] Section 4 of the Agreement relates to compensation. Section 4.1 provides: "During the Term, [McBride] shall be compensated at an annual rate equal to the Annual Base Salary." It also provides for an annual salary review and possible raises. Section 4.2 reads: "[McBride] shall be eligible for an annual incentive bonus determined from time to time in accordance with Annex C hereto." It also mentions his participation in stock options, a matter not relevant here. Section 4.3 provides for other benefits available to all employees, such as insurance, reimbursement for business expenses and paid time off. Annex C to the Agreement outlines the specifics of McBride's compensation package: (1) he "will receive a yearly salary of $230,000 [paid bi-weekly]"; (2) he will receive a "Signing Bonus" (the signing bonus is not mentioned in the body of the Agreement), consisting of an initial $415,000 payment (which he received upon signing the Agreement) and a contingent $474,000 payment one year later (for ease of reference the $474,000 is referred to as the "contingent payment");[3] and (3) he will receive an

---

[1] The Agreement appears in Market Street's Appendix, Volume IV at 670-684. Section 3.1 provides: "This Agreement shall remain in effect for the Term." "'Term' means the period commencing on the date hereof and ending on the third anniversary of such date."

[2] The Western Division included the branches Market Street acquired from Major Mortgage as well as Market Street's offices in Denver and Longmont, Colorado.

[3] The "Signing Bonus" provision provides:

annual "Net Contribution Incentive" (specifically referenced in the body of the Agreement) if the Western Division is profitable.[4]

The Agreement allows either party to terminate prior to its expiration (1) for cause without giving notice or (2) without cause if the terminating party gives thirty days written notice. As to McBride, cause (for Market Street to terminate) consists of his dishonesty, incompetency, willful misconduct, breach of fiduciary duty involving personal profit, intentional failure to perform his duties, willful violation of any law, rule or regulation, material breach of any provision of the Agreement, or continued failure to substantially perform his duties after written notice identifying shortcomings. As to Market Street, cause (for McBride to terminate) is more detailed:

(a) a reduction by the Company in [McBride's] Annual Base Salary;

(b) a material diminution in powers, responsibilities or duties of [McBride] that occurs within one year after a Change in Control;

(c) the Company requiring [McBride] to be based at a location more than

---

You will receive a signing bonus of $415,000 to be paid on the 1st official payday applicable to start date. In addition, you will receive an additional $474,000, assuming that $600,000,000 in volume is originated and closed within 12 months from the date of the acquisition by Market Street Mortgage Corporation. This payment would be paid in July, 2006.

This provision implemented Market Street's agreement with WERCS (set forth in Market Street's letter of intent) to pay a total of $1.5 million to McBride, Mott, Clark, Carver and Zeiler within the first year of Market Street's acquisition of Major Mortgage. McBride was permitted to determine how that $1.5 million would be divided among the five recipients.

[4] Under the net contribution incentive plan, for every dollar of profit earned by the Western Division, Market Street would place thirty percent of it into a pool. After the branch managers were paid their incentives from the pooled funds, McBride would receive forty percent of the remainder.

100 miles from the Business Location;

(d) the failure by the Company to pay [McBride] any portion of [his] current compensation within seven days of the date such compensation is due, other than an isolated, insubstantial and inadvertent failure not occurring in bad faith and which is remedied by the Company promptly after receipt of notice thereof given by [McBride];

(e) the failure by the Company to continue any material benefit plan in which [McBride] participates immediately prior to the Effective Date (unless (i) the discontinued plan is replaced by the Company with another plan that . . . is reasonably equivalent to the discontinued plan or (ii) the failure did not occur in bad faith and is remedied by the Company . . .); or

(f) any termination by the Company of [McBride's] employment other than as expressly permitted by this Agreement.

Under Section 3.3 of the Agreement, "Effect of Termination," if McBride's employment is terminated by Market Street for cause or by McBride without cause, Market Street's only obligation is to pay McBride any amounts due and owing to him on the date of termination. However, if Market Street terminates without cause or McBride terminates for cause, Market Street is required to meet its obligations under Section 3.4. That section, titled "Termination Payments," states in relevant part:

In the event [McBride's] employment is terminated [by Market Street without cause or by McBride for cause] prior to the expiration of the Term . . ., the Company shall pay to [McBride] as severance pay and liquidated damages a lump sum amount equal to the sum of the (a) Annual Base Salary and (b) Incentive Compensation . . . .  In addition, for a period of twelve months following the effective date of the termination . . ., the Company shall continue to provide to [McBride] . . . [his] benefits . . .; provided, however, that in lieu of providing health benefits, the Company shall pay [McBride] an amount equal to the difference between (x) the cost of COBRA health continuation coverage . . . and (y) the amount for which [McBride] would have been responsible to pay under the health benefit plans in effect . . . immediately prior to his termination . . . .

Additionally, if Market Street terminates without cause or McBride terminates for cause,

- 5 -

McBride is relieved from the Agreement's non-solicitation and non-competition provisions.

## C.     The February 15 Meeting - Reduction in Salary

The Western Division was profitable the first month after Market Street's acquisition of Major Mortgage. Thereafter, its branches began incurring expenses they had not incurred prior to the acquisition. As a result, the Western Division's profitability declined and by year-end it had a net loss.

On February 15, 2006, McBride and Mott met with a number of Market Street executives—Randy Johnson (President and Chief Executive Officer (CEO)), Donnell Smith (Executive Vice President), Steven Joyce (Senior Vice President of Strategic Planning and Development) and Deborah Renner (Vice President of Financial Operations)—to discuss the Western Division's lack of profitability. Smith said the salaries in the Western Division were too high and needed to be reduced.[5] Johnson agreed but said the salaries should be structured so they could be earned back if the Western Division met identified profit goals. Two days later, on the morning of February 17, Johnson and Smith agreed to reduce McBride and Mott's salaries and discussed the level of reduction, settling on $85,000 for McBride. Johnson directed Smith to talk with McBride and Mott and to check their employment agreements for compliance before sending letters notifying them of the reduction.[6]

---

[5] It is contested whether or not Smith specifically mentioned reducing McBride and Mott's salaries.

[6] According to Smith's testimony, Johnson instructed him to check with the Human Resources Department to ensure compliance with employment agreements prior

D.    Smith's Letter to McBride

After his discussion with Johnson, Smith drafted letters to McBride and Mott.  The

letter to McBride, dated February 17, 2006, stated:

> As we discussed in our meeting on February 15th, your annual
> compensation will be reduced from $230,000 to $85,000, effective March
> 1, 2006.  However, if the Western Division net branch contribution is 35
> [basis points] by year-end, you will receive your normal year-end incentive
> based on your incentive plan.
>
> In addition, if you achieve these results the difference between your initial
> salary and the reduced salary as of March 1, 2006 will be paid to you.  I
> hope you believe this is a fair plan and something you and [Mott] can work
> towards to make 2006 a successful year for the Western Division.

(R. Vol. IV at 685.)[7]  He also drafted a similar letter to Mott and showed copies of both

letters to Joyce and Renner.  He then gave the letters to his assistant to mail as he was

scheduled to be out of the office for a period of time.  Smith neither spoke to McBride (or

Mott) nor checked employment agreements prior to directing the letters to be sent.

McBride received Smith's letter in his Cheyenne office on February 24, 2006.  He

was "absolutely shocked" because no one had discussed it with him.  (R. Vol. III at 413.)

He believed it indicated Market Street "wanted [him] gone."  (*Id.*)  On February 27,

Johnson signed an "Associate Status Change Form" indicating McBride's salary was

being adjusted to $85,000 effective March 1, 2006.  (R. Vol. IV at 701.)  The form was

_____

to sending the letters reducing McBride and Mott's salaries.  He did not recall Johnson
telling him to speak with McBride and Mott before sending the letters but conceded he
knew he should have done so.

[7] In addition to informing McBride of a reduction in his Annual Base Salary, the
letter's reference to "35 [basis points]" made it more difficult for McBride to earn the
"Net Contribution Incentive."

also signed by Renner and file stamped: "ENTERED FEB 27 2006 Human Resources."

(*Id.*)

E.      McBride's Notice of Termination for Cause

The next day, February 28, McBride faxed and mailed a letter to Johnson stating:

> This is to provide notice of termination of my Employment Agreement with Market Street Mortgage Corporation for cause pursuant to section 3.2.2(a) of the Agreement. The cause is a reduction by the Company in my annual base salary. I was notified in writing dated February 17, 2006 that my annual compensation would be reduced, effective March 1, 2006. Such action breaches the terms of my contract and constitutes "cause" for termination by me provided in section 1.5.2 of the Agreement.
>
> I am providing notice that my employment with Market Street Mortgage Corporation is effectively terminated as of 5:00 pm MST on February 28, 2006.

(R. Vol. IV at 687.) He also sought immediate payment of the "Termination Payments" under Section 3.4 of the Agreement. On that same day, he had his assistant remove his personal property from his Market Street office.

After receiving McBride's letter, Johnson called McBride twice and sent him an e-mail requesting a return call. McBride did not receive Johnson's calls because he was traveling but did receive the e-mail and called Johnson that night. Johnson told McBride he believed Smith had talked to him prior to sending the February 17 letter and asked McBride to call him back the next day, March 1.

F.      The Mistake

McBride called Johnson on March 1. Johnson told McBride the February 17 letter was a mistake, his salary had not been reduced and he wanted to talk with McBride about moving the Western Division forward. Johnson admitted he was aware McBride would

- 8 -

be receiving a notice of salary reduction but Smith was directed to talk to McBride before sending the notice. McBride said he would be happy to talk with Johnson but informed him he had trust issues with Smith and did not feel he could return to Market Street. Johnson asked McBride to think about returning and said McBride could report directly to him, rather than Smith, were he to return. McBride did not believe that arrangement would work because Johnson and Smith had worked together for over twenty years and he told Johnson so; nevertheless, he agreed to consider it and to contact Johnson on March 3.

On March 1, Johnson also sent McBride a letter stating the February 17 letter, "which outlined a reduction in your salary, was sent in error. No change in your compensation has been made." (R. Vol. IV at 688.) Additionally, he informed the Human Resources Department not to process the "Associate Status Change Form." The Human Resources Department wrote on the form "Per Randy [Johnson]—Done in error—should not be processed. Deleted from system." (*Id.* at 701.)

G.   McBride Decides Not to Return to Market Street

On March 3, McBride called Johnson saying he would not return to Market Street. He told Johnson about a conversation he had with Mott, who said before the February 15 meeting Smith had asked Kip Clark if he would be willing to take over the Western Division should McBride and Mott be gone. Johnson said he was not aware of Smith's conversation with Clark. He did indicate, however, that McBride and Mott had higher salaries than any other regional managers and admitted he had agreed with Smith their salaries needed to be brought more in line with the other managers. McBride followed up

this conversation with a letter to Johnson reiterating that he was not willing to rejoin Market Street. McBride's letter explained he did not believe the February 17 letter was a "mistake" because (1) it was sent by Smith, to whom he reported; (2) Smith had approached Clark about replacing McBride before sending the letter; and (3) at the February 15 meeting Smith said (and Johnson agreed) McBride's salary needed to be reduced. (R. Vol. IV at 689.) McBride stated: "It appears the only mistake is that apparently no one bothered to read the Employment Agreement regarding my right to terminate the contract and receive the severance payment and liquidated damages set forth in the contract." (*Id.* at 689-90.) He again requested payment of Section 3.4's "Termination Payments."

On March 3, Johnson sent McBride a letter confirming his March 1 telephone statement that the February 17 letter had been sent in error and there had been no change in McBride's Annual Base Salary. Therefore, Johnson claimed, there was no cause for McBride to terminate the Agreement and Market Street considered McBride's termination to be without cause. Johnson also referred McBride to the non-solicitation and non-competition clauses of the Agreement.

On March 31, McBride began working for Freedom Mortgage for $190,000 per year. He left two months later. In July 2006, he began working for Republic Mortgage for $60,000 per year.

## II.    PROCEDURAL BACKGROUND

McBride filed suit against Market Street making four claims: (1) entitlement to the "Termination Payments" under Section 3.4 of the Agreement based on his termination of

the Agreement for cause (the termination for cause claim); (2) a declaration that he terminated the Agreement for cause and therefore was not bound by its non-solicitation and non-competition provisions; (3) breach of the Agreement based on Market Street's unilateral reduction of his salary and incentive compensation as well as breach of the implied covenant of good faith and fair dealing; and (4) tortious interference with a prospective economic advantage based on Market Street's attempt to enforce the Agreement's non-solicitation and non-competition provisions (as evidenced by Johnson's March 3 letter referring to those provisions). Market Street answered and asserted several counterclaims against McBride including breach of the Agreement's non-competition provisions because of McBride's post-termination employment with Freedom Mortgage. Two months later, Market Street voluntarily dismissed its counterclaims.

Market Street moved for summary judgment on several grounds. The district court granted the motion on McBride's tortious interference claim. The remaining issues proceeded to trial. The breach of good faith and fair dealing claim was dismissed at the close of McBride's evidence upon Market Street's oral motion for judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure. The court determined Wyoming did not recognize such a claim in the employment law context.

The jury returned a verdict in favor of McBride. It found "the actions of Defendant Market Street constituted a 'reduction by the Company in [McBride's] Annual Base Salary'"; "McBride was entitled to terminate his employment for cause"; and "Defendant Market Street Mortgage Corporation breached the Employment Agreement

with [McBride]." (R. Vol. IV at 802.) The jury awarded McBride $242,000 on the termination for cause claim and $652,000 on the breach of contract claim. Based on the jury's verdict, the court relieved McBride of any non-competition and non-solicitation obligations. It denied Market Street's post-verdict motion for judgment as a matter of law or in the alternative for new trial or remittitur under Rules 50(b) and 59 of the Federal Rules of Civil Procedure.

## III. CHOICE OF LAW

The Agreement contains a choice-of-law provision: "This Agreement shall be construed and enforced under and in accordance with Federal law, where applicable, and then with the laws of the State of Georgia." (R. Vol. IV at 678.) Because this is a diversity case, we apply Wyoming law to determine whether to enforce the Agreement's choice-of-law provision. *See Vitkus v. Beatrice Co.*, 127 F.3d 936, 941 (10th Cir. 1997) ("A federal court sitting in diversity . . . must apply the substantive law of the forum state, including its choice of law rules."). Wyoming will enforce a contractual choice-of-law provision unless (1) the parties' chosen state has no reasonable relationship to the parties or transaction or (2) application of the foreign state's law would be contrary to Wyoming's law, public policy or the general interests of its citizens. *Res. Tech. Corp. v. Fisher Scientific Co.*, 924 P.2d 972, 975 (Wyo. 1996).

Georgia has a reasonable relationship to the parties and transaction in this case. Market Street's parent corporation, NetBank Inc., is headquartered in Georgia and the Agreement was derived from a form created and used by NetBank. Moreover, because the contract laws of Georgia and Wyoming are similar, application of Georgia law in this

case would not offend the law or public policy of Wyoming or the general interests of its citizens. Consequently, Wyoming would likely enforce the parties' choice-of-law provision; neither party contends otherwise. *See id.* (enforcing choice-of-law provision where defendant was headquartered in the chosen state and chosen state's laws similar to Wyoming's).

While the district court enforced the Agreement's choice-of-law provision, it only applied Georgia law to McBride's termination for cause claim; it applied Wyoming law to the breach of contract claim and applied both Wyoming and Georgia law in determining the propriety of the jury's damages award. The court apparently believed the choice-of-law provision only applied to the termination for cause claim because only that claim involved the "constru[ction] and enforce[ment]" of the Agreement. (R. Vol. IV at 678.) It was mistaken. Georgia law should have been applied not only to the termination for cause claim but also to the breach of contract claim and to the review of the jury's damages award because they too were premised on the Agreement. *See Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo., Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005) (applying New York law to plaintiff's breach of contract and third-party beneficiary claims where choice-of-law provision stated terms and conditions of contract shall be governed and interpreted by New York law); *Century 21 Real Estate Corp. v. Meraj Int'l Inv. Corp.*, 315 F.3d 1271, 1281 (10th Cir. 2003) (applying New Jersey law to claim that jury's breach of contract damages award was excessive where choice-of-law provision stated New Jersey law would govern the "construction" of the contract). We apply Georgia law.

## IV.    DISCUSSION

Market Street challenges the jury's liability and damages verdicts and the district court's entry of a declaratory judgment.

### A.    Jury Liability Verdicts and Declaratory Judgment

In its motion for summary judgment, Market Street argued, *inter alia*, McBride's termination of the Agreement was without "cause" because he never suffered a "reduction by the Company in [his] Annual Base Salary" as his salary was never reduced. The district court concluded the term "reduction" was ambiguous because it was unclear whether the parties intended it to require the actual receipt of a reduced paycheck or mere notice of a reduction. It determined this ambiguity needed to be resolved by the jury. At the close of McBride's trial evidence, Market Street orally moved for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, again arguing the interpretation of "reduction" was for the court, not the jury, and "under any reasonable interpretation of the reduction language . . . simply receiving a letter, without more, [does not] constitute[] a reduction." (R. Vol. III at 542.)  The court denied the motion. Repeating the arguments made to the district court, Market Street contends its Rule 50(a) motion should have been granted and the court improperly sent the interpretation of the phrase "reduction by the Company in [McBride's] Annual Base Salary" to the jury.

We review the denial of a motion for judgment as a matter of law de novo. *Bayless v. Christie, Manson & Woods Int'l, Inc.*, 2 F.3d 347, 351 (10th Cir. 1993). Contract interpretation is a question of law in Georgia, *see Mon Ami Int'l., Inc. v. Gale*,

592 S.E.2d 83, 86 (Ga. Ct. App. 2003), which is also reviewed de novo. *Kaw Nation v. Springer*, 341 F.3d 1186, 1189 (10th Cir. 2003).

Georgia applies a three-step analysis in construing a contract. First, a court must decide whether the contract's language is clear and unambiguous. *Covington Square Assocs., LLC v. Ingles Mkts., Inc.*, 641 S.E.2d 266, 268 (Ga. Ct. App. 2007). "Contract language is unambiguous if it is capable of only one reasonable interpretation." *Pipkin v. Cora Bett Thomas Realty Co.*, 650 S.E.2d 394, 395 (Ga. Ct. App. 2007) (quotations omitted); *see also Ben Farmer Realty, Inc. v. Owens*, 649 S.E.2d 771, 774 (Ga. Ct. App. 2007) ("Ambiguity exists when a contract is uncertain of meaning, duplicitous, and indistinct, or when a word or phrase may be fairly understood in more than one way.") (quotations omitted). If the language is unambiguous, no construction is required and the court simply enforces the contract according to its terms. *Covington Square Assocs.*, 641 S.E.2d at 268. Second, if the contract is ambiguous, the court applies the rules of contract construction to resolve the ambiguity. *Id.* ("If the court determines that an ambiguity exists, . . . a jury question does not automatically arise, but rather the court must first attempt to resolve the ambiguity by applying the rules of construction . . . ."). Finally, if the contract remains ambiguous after applying the rules of construction, the meaning of ambiguous language and the intent of the parties are jury questions. *Id.*

The Agreement does not define "a reduction by the Company in [McBride's] Annual Base Salary," in particular, the word "reduction." The plain and ordinary meaning of "reduction" is "the act or process of reducing: the state of being reduced." *See* www.merriam-webster.com. "[R]educe" means "to diminish in size, amount, extent,

- 15 -

or number." *Id.* These definitions are not helpful because they do not define the "act" or "process." As the parties' arguments illustrate, the act or process could reasonably mean (1) the decision to reduce, (2) the decision to reduce and notification thereof, or (3) the decision to reduce and the actual receipt of a paycheck at the lower rate. Because it is susceptible to more than one reasonable meaning, the language is ambiguous. But, contrary to the district court's conclusion, the rules of contract construction resolve the ambiguity.

The cardinal rule is to ascertain the parties' intent. *Covington Square Assocs.*, 641 S.E.2d at 269. To determine that intent, "all the contract terms must be considered together in arriving at the construction of any part, and a construction upholding the contract in whole and every part is preferred." *DBL, Inc. v. Carson*, 645 S.E.2d 56, 62 (Ga. Ct. App. 2007). "[A] court should, if possible, construe a contract so as not to render any of its provisions meaningless and in a manner that gives effect to all of the contractual terms." *Pomerance v. Berkshire Life Ins. Co. of Am.*, 654 S.E.2d 638, 641 (Ga. Ct. App. 2007) (quotations omitted). A contract's words are to be given their usual and common significance and a contract will be strictly construed against its drafter. *Eastside Gardens of Snellville, LLC v. Sims*, 547 S.E.2d 383, 385 (Ga. Ct. App. 2001).

Both parties point to provisions in the Agreement supporting their respective interpretations of "reduction." Market Street points to Annex C, which outlines McBride's compensation package and uses the term "receive" several times. It alleges these references demonstrate McBride must <u>receive</u> a salary less than $230,000 annually in order to experience a "reduction." Market Street also points to the other situations

- 16 -

besides "a reduction by the Company in [McBride's] Annual Base Salary" in which the Agreement allows McBride to terminate for cause. Two of those situations are "a material diminution in [McBride's] powers, responsibilities or duties" occurring within one year from the date of acquisition and "the failure by the Company to pay [McBride] any portion of [his] current compensation within seven days of the date such compensation is due." (*Id.* at 671.) It alleges these situations require an <u>actual</u> diminution in powers or failure to pay, not merely a notice. Consequently, Market Street asserts "a reduction by the Company in [McBride's] Annual Base Salary" also requires an <u>actual</u> reduction.

Not surprisingly, McBride contends Market Street's interpretation is inconsistent with other provisions of the Agreement, namely, the provision allowing McBride to terminate the Agreement for cause for "the failure by the Company to pay [McBride] any portion of [his] current compensation within seven days of the date such compensation is due." If Market Street's interpretation of a "reduction by the Company in [McBride's] Annual Base Salary" is adopted, this provision would be rendered meaningless. In order to give effect to both provisions, McBride asserts, a "reduction by the Company in [McBride's] Annual Base Salary" must address a decision to reduce the contract salary whereas "the failure by the Company to pay [McBride] any portion of [his] current compensation within seven days of the date such compensation is due" addresses the situation where there is no decision or notice of reduction but Market Street simply fails to actually pay the agreed salary.

We agree with McBride. Construing the Agreement as a whole, the term

- 17 -

"reduction" does not require actual receipt of a reduced paycheck—a decision to reduce and notice thereof is sufficient. Among the six situations entitling McBride to terminate for cause are subsection (a)—"a reduction by the Company in [McBride's] Annual Base Salary"—and subsection (d)—"the failure by the Company to pay [McBride] *any portion* of [his] current compensation within seven days of the date such compensation is due." (Emphasis added.) By separately listing these two provisions in the same section, the parties necessarily intended for disparate meaning, *i.e.*, to constitute distinct "causes" permitting McBride to terminate. Were we to adopt Market Street's interpretation of subsection (a), the two clauses would overlap and subsection (d) would be rendered superfluous. Not only does that interpretation contradict the parties' obvious intent, it violates a fundamental rule of contract construction—a contract should be construed so as not to render any of its provisions meaningless. *See Vaughn, Coltrane & Assocs. v. Van Horn Constr., Inc.,* 563 S.E.2d 548, 550 (Ga. Ct. App. 2002). McBride's interpretation of subsection (a), on the other hand, is faithful to the language of the Agreement by giving effect to both subsection (a) and subsection (d).

Section 4 of the Agreement also supports McBride's interpretation. It states McBride's Annual Base Salary shall be reviewed annually by Market Street's CEO and McBride "shall be entitled to receive annually an increase in such amount, if any, as may be determined by the [CEO]. Such salary shall be payable in accordance with the Company's normal payroll practices." Under Section 4, all that is required to increase McBride's Annual Base Salary is a determination by the CEO (Johnson). While that "determination" will be implemented in McBride's paychecks, a paycheck is not a

- 18 -

prerequisite for that "determination." Logically, if all that is required to increase McBride's Annual Base Salary is an official "determination," then an official "determination" or decision is all that is required to reduce it.

Moreover, the Agreement was derived from a form created by Market Street's parent corporation which Market Street adapted for its managers. While McBride negotiated the terms and Annual Base Salary and decided how to divide the bonuses among Major Mortgage's five-member management team, he had no role in drafting the Agreement. Therefore, any ambiguity must be construed against Market Street. *Eastside Gardens of Snellville, LLC*, 547 S.E.2d at 385.

Because any ambiguity in the contested language can be resolved by the rules of contract construction, the issue should not have been sent to the jury.[8] Nevertheless, the district court correctly denied Market Street's Rule 50(a) motion because it was based on an improper interpretation of the term "reduction" as requiring more than a decision and notification. Moreover, the jury's verdict is consistent with the proper contract interpretation and there was more than sufficient evidence at trial demonstrating a decision to reduce and notification thereof.[9] The reduction in McBride's salary may have

---

[8] Market Street argues that even assuming the district court correctly sent the interpretation of "reduction by the Company in [McBride's] Annual Base Salary" to the jury, the court erred in refusing to tender its proposed jury instruction providing the dictionary meaning of "reduction." Because the court should not have sent the issue to the jury, this argument is moot. In any event, there was no error. As explained previously, the dictionary definition of "reduction" is not helpful and the jury reached the correct result.

[9] Smith and Johnson agreed McBride's salary should be reduced to $85,000. Johnson knew Smith would be drafting a letter informing McBride of the decision to

been ill-advised, but it was not a "mistake."  The real "mistake," failing to appreciate

consequences, is not excusable, as a simple clerical error might be.

As a final attempt to set aside the jury's verdicts, Market Street contends that even

if McBride suffered a reduction in his Annual Base Salary, his breach of contract claim

fails because such a reduction does not constitute a breach of the Agreement.  It claims

the Agreement clearly contemplates that a reduction in the Annual Base Salary may

occur.  Because it had a right to reduce McBride's salary, the fact it did so is not a breach.

Market Street raised this argument in its oral Rule 50(a) motion.  The district court did

not specifically address that argument in denying the motion but did so implicitly by

erroneously allowing the issue to go to the jury.[10]

Market Street had a duty under the Agreement to pay McBride $230,000 a year for

three years[11] unless the parties agreed in writing to a different amount[12] or the CEO

---

reduce.  Smith did in fact draft a letter to McBride notifying him of that decision and
Johnson signed an "Associate Status Change Form" implementing that decision with
Market Street's payroll department.  Smith mailed the letter to McBride who received it.

[10] Interpreting the Agreement is a question of law for the court.  *Mon Ami Int'l.,
Inc.,* 592 S.E.2d at 86.

[11] Section 4 of the Agreement provides:

[McBride] *shall receive* the following salary and benefits:

4.1 Annual Base Salary.  During the Term, [McBride] *shall be* compensated at an
annual rate equal to the Annual Base Salary.  The Annual Base Salary and
performance shall be reviewed by the Chief Executive Officer annually, and
[McBride] shall be entitled to receive annually an increase in such amount, if any,
as may be determined by the Chief Executive Officer . . . .

(Emphasis added.)  Under "Annual Base Salary," Annex C says "[McBride] *will receive*
a yearly salary of $230,000."  (Emphasis added.)

[12] The Agreement states: "No amendment or modification of this Agreement shall

- 20 -

determined at the annual review that McBride was entitled to a salary increase.[13] Market Street may have breached this duty by unilaterally reducing McBride's Annual Base Salary.[14] But we see no reason to engage in such analysis. Whether it was a breach of the Agreement or cause for McBride to terminate the Agreement, the measure of damages flowing from such a reduction is the same, dictated by Section 3.4 of the Agreement—his Annual Base Salary, Incentive Compensation and his health benefits for one year or the difference between the cost of COBRA benefits and the amount McBride paid for benefits at Market Street at the time of his termination for one year.

In addition to the salary reduction, McBride's breach of contract claim was based on Market Street changing the terms of his net contribution incentive compensation and failing to pay him Section 3.4's "Termination Payments."[15] The evidence showed

be valid or binding upon [Market Street] or [McBride] unless made in writing and signed by both parties."

[13] Notably, McBride's annual review could only result in an increase in the Annual Base Salary, not a reduction. Under the maxim *expressio unius est exclusio alterius*— "[t]he express mention of one thing implies the exclusion of another"—we may presume the omission of allowing a reduction in salary after an annual review was deliberate. *See Krogh v. Pargar, LLC*, 625 S.E.2d 435, 439 (Ga. Ct. App. 2005).

[14] The United States District Court for the Northern District of Texas reached a different result in Mott's lawsuit against Market Street based on the reduction of his salary. *See Mott v. Mkt. St. Mortgage Corp.*, No. 3:06-CV-0423-M, 2007 WL 2457609 (N.D. Tex. Aug. 29, 2007). It concluded "the reduction in Mott's salary was not a breach of the Employment Agreement [because] the agreement specifically contemplated that Market Street might reduce Mott's salary and provided for that contingency in § 3.4." *Id.* at *4. Of course we are not bound by that decision, but at the end of the day the result we reach is not substantially different.

[15] McBride also alleged Market Street breached the Agreement because the February 17 letter placed conditions on his ability to earn his Annual Base Salary. We do not consider this a separate breach from the reduction in his Annual Base Salary. At oral

Smith's letter changed the terms of McBride's net contribution incentive compensation, making it more difficult to earn. And it was undisputed Market Street never paid McBride the "Termination Payments." These actions may have breached the Agreement, but, as we explain below, any resulting damages were not proved or are limited to interest. Accordingly, the jury's damages awards are excessive.

B.    Damages

Market Street complains the jury's damages awards are excessive because they exceed the "Termination Payments" provided for in the Agreement, which it claims amounted to $242,000 —McBride's Annual Base Salary ($230,000) plus the difference in the cost of his insurance ($12,000).[16] We agree.

1.    Termination for Cause Claim

Under the Agreement, Market Street was obligated to pay McBride the "Termination Payments" if he terminated for cause. "Termination Payments" is defined in the Agreement as the sum of (1) the Annual Base Salary, (2) the Incentive Compensation and (3) health benefits for one year or the difference between the cost of COBRA benefits and the amount McBride paid for benefits at Market Street at the time of his termination for one year. The Agreement provides McBride's Annual Base Salary is $230,000. It defines "Incentive Compensation" as "the highest annual incentive bonus

---

argument, McBride argued for the first time that Market Street breached the Agreement by attempting to enforce its non-solicitation and non-competition provisions. We will not consider this argument. *Fed. Ins. Co. v. Tri-State Ins. Co.*, 157 F.3d 800, 805 (10th Cir. 1998) ("Issues raised for the first time at oral argument are considered waived.").

[16] Market Street also alleges McBride received an impermissible double recovery. Because we conclude the damages awards are excessive, we need not address this issue.

paid or payable to [McBride] . . . for any of the two fiscal years . . . immediately prior to the fiscal year in which the date of termination of employment occurs." (R. Vol. IV at 671.) The only "annual incentive bonus" is the "Net Contribution Incentive" which McBride was only entitled to if the Western Division was profitable.[17] The evidence was clear the Western Division was not profitable. Finally, the evidence demonstrated McBride was paying $400 per month for benefits at Market Street at the time of his termination for cause and had paid $1,400 in COBRA benefits for one month after his

---

[17] McBride argues the contingent part of his signing bonus is part of his "Incentive Compensation." Market Street contends McBride would only be entitled to the $474,000 contingent payment if the Western Division originated and closed $600 million in volume and he remained in Market Street's employ until the contingent payment was earned and paid.

The evidence at trial demonstrated the Western Division reached the July 2005 to July 2006 volume goal, but McBride terminated his involvement with Market Street on March 1, 2006, and was thus gone for at least four of the relevant twelve months. In retrospect it is clear that had he stayed with Market Street for a few more months, applying his shoulder to the wheel, he would have been entitled to the contingent portion of the signing bonus. But he did not. While the signing bonus language does not specifically require McBride to be employed by Market Street in July 2006 or to have contributed one year's effort in order to qualify for the one time/one year contingent bonus payment, it is fairly implied.

In any event, the $474,000 contingent payments does not meet the definition of "Incentive Compensation" contained at Section 4.2 of the Agreement, which provides:

> Incentive Compensation. [McBride] shall be eligible for an annual incentive bonus determined from time to time in accordance with Annex C hereto. In addition, [McBride] shall be entitled to participate in such stock option programs as are made available to similarly situated executives of [Market Street] from time to time. Any options granted will comply in all respects with the terms of the NetBank, Inc. Stock Incentive Plan.

The signing bonus (initial payment or contingent payment) does not satisfy the Agreement's definition of "Incentive Compensation" as the described payments are not an "annual incentive bonus." The only annual bonus mentioned in Annex C is the "Net Contribution Incentive Plan," for which, as we will discuss, McBride did not qualify.

- 23 -

termination. Therefore, the difference in these monthly amounts ($1,000) for one year is $12,000. Consequently, the "Termination Payments" totaled $242,000 ($230,000 plus $12,000)—the amount awarded by the jury on the termination for cause claim.

2.      Breach of Contract Claims

In its oral Rule 50(a) motion and its written motion for remittitur or in the alternative a new trial, Market Street argued McBride's breach of contract damages were limited to the liquidated damages specified in the Agreement, *i.e.*, Section 3.4's "Termination Payments." The district court denied Market Street's Rule 50(a) motion on this basis believing the matter should go to the jury. It also rejected Market Street's motion for new trial and remittitur. It concluded Section 3.4 is not a liquidated damages provision for all breaches of the Agreement but instead provides payment only when one of the situations allowing McBride to terminate for cause occurs. Therefore, Section 3.4 did not prevent McBride from being awarded damages on his other alleged breaches, *i.e.,* Market Street's changing the terms of his incentive compensation and failing to pay him Section 3.4's "Termination Payments," because they were not situations by which McBride could terminate for cause. The court also concluded the jury award was not excessive, finding McBride's full lost salary,[18] the $474,000 contingent signing bonus payment and other incidental damages, could "easily add up" to the jury's awards. (R. Vol. IV at 880.)

We review for an abuse of discretion a court's denial of a motion for new trial or

_____

[18] $230,000 per year for the remainder of the Agreement's three-year term, less mitigation—his actual and projected earnings for that period.

- 24 -

remittitur grounded on a claim the jury's damages award was excessive. *Blanke v. Alexander*, 152 F.3d 1224, 1236 (10th Cir. 1998). To the extent Market Street's excessiveness argument challenges the district court's interpretation of the Agreement, our review is de novo. *Kaw Nation*, 341 F.3d at 1189; *Mon Ami Int'l., Inc.*, 592 S.E.2d at 86. "The determination of whether a specified sum is enforceable as liquidated damages is a question of law" which we review de novo. *Kaw Nation*, 341 F.3d at 1189; *Antonios v. Gwinnett Clinic, Ltd.*, 668 S.E.2d 531, 532 (Ga. Ct. App. 2008).

We agree with Market Street. Analyzing the damages resulting from each breach separately, the jury's $652,000 breach of contract damages must be set aside.

### a)    Reduction in Annual Base Salary

We have already concluded Market Street's reduction in McBride's Annual Base Salary allowed McBride to terminate the Agreement for cause and may have constituted a breach of the Agreement. Section 3.4 of the Agreement provides that in the event McBride terminates the Agreement for cause, Market Street shall pay McBride

> as severance pay *and liquidated damages* a lump sum amount equal to the sum of the (a) Annual Base Salary and (b) Incentive Compensation . . . . In addition, for a period of twelve months following the effective date of the termination . . ., the Company shall continue to provide to [McBride] . . . [his] benefits . . . ; provided, however, that in lieu of providing health benefits, the Company shall pay [McBride] an amount equal to the difference between (x) the cost of COBRA health continuation coverage . . . and (y) the amount for which [McBride] would have been responsible to pay under the health benefits plans in effect . . . immediately prior to his termination . . . .

(Emphasis added.) The question is whether this provision is an enforceable liquidated damages clause under Georgia law, thereby limiting Market Street's liability for reducing

McBride's salary to the "Termination Payments" provided by Section 3.4. We believe it is.

Georgia allows parties to agree "in their contract to a sum to liquidate their damages." *S.E. Land Fund, Inc. v. Real Estate World*, *Inc.*, 227 S.E.2d 340, 343 (Ga. 1976). "If the parties agree in their contract what the damages for a breach shall be, they are said to be liquidated and, unless the agreement violates some principle of law, the parties are bound thereby." Ga. Code Ann. § 13-6-7. A liquidated damages provision is enforceable if: "(1) the injury caused by the breach of the contract is difficult or impossible to accurately estimate; (2) the parties intended to provide for damages rather than a penalty; and (3) the sum stipulated upon by the parties is a reasonable pre-estimate of the probable loss." *Caincare, Inc. v. Ellison*, 612 S.E.2d 47, 50 (Ga. Ct. App. 2005). Where a designated sum is inserted into a contract for the purpose of deterring one or both of the parties from breaching it or where it plainly has no reasonable relation to any probable actual damage which may follow a breach, the contractual provision will be construed as an unenforceable penalty. *Id.*; *see also Lager's, LLC v. Palace Laundry, Inc.*, 543 S.E.2d 773, 778-79 (Ga. Ct. App. 2000).

Here, the injury caused to McBride by the reduction in his Annual Base Salary is difficult or impossible to estimate accurately. The scope of his injury would depend on when in the three-year term of the Agreement the reduction occurred and his ability to mitigate his damages by obtaining a new position. *See* Ga. Code Ann. § 13-6-5 ("Where by a breach of contract a party is injured, he is bound to lessen the damages as far as is practicable by the use of ordinary care and diligence."); *see also Boone v. Atlanta Ind.*

- 26 -

*Sch. Sys.*, 619 S.E.2d 708, 712 (Ga. Ct. App. 2005). It also would depend on whether he would have been entitled to his "Net Contribution Incentive," which in turn would depend on whether Market Street would have been profitable at the end of the year had McBride not terminated for cause.

It is also clear the parties intended Section 3.4 to provide for damages rather than a penalty. Section 3.4 expressly states Market Street will pay McBride the "Termination Payments" as "liquidated damages." This contractual language is indicative of the parties' intent for the damages to be liquidated. *See Caincare, Inc.* 612 S.E.2d at 50; *see also Liberty Life Ins. Co. v. Thomas B. Hartley Constr. Co.*, 375 S.E.2d 222, 223 (Ga. 1989) ("[T]here is no question the parties intended to provide for liquidated damages— the damages clause was denominated as liquidated by the parties . . . ."); *Nat'l Emergency Servs., Inc. v. Wetherby*, 456 S.E.2d 639, 641 (Ga. Ct. App. 1995) (although employee's uncontradicted affidavit stated he and the employer never discussed any figure which would represent the employer's damages in the event of a breach, the language of the employment contract itself uses the phrase "liquidated damages" to describe the amount; court "must first look to the language of the contract to determine whether the parties intended the provision in question to be a penalty or a legally cognizable liquidated damages clause").[19]

---

[19] In *S.E. Land Fund, Inc.*, the Georgia Supreme Court said the label prescribed to a provision is not determinative of whether it is a liquidated damages or penalty provision. 227 S.E.2d at 342. However, in diversity jurisdiction cases, we are obligated to follow the most recent pronouncement of the state's highest court—in this case, *Liberty Life Ins. Co. See Otis Elevator Co. v. Midland Red Oak Realty, Inc.*, 483 F.3d 1095, 1102 n.10 (10th Cir. 2007).

Finally, the "Termination Payments," which is defined as McBride's Annual Base Salary, his Incentive Compensation and his health benefits for one year or the difference between the cost of COBRA benefits and the amount McBride paid for benefits at Market Street at the time of his termination for one year, is a reasonable pre-estimate of McBride's probable loss. Although there was no testimony as to how the parties arrived at the "Termination Payments," it is clear they generally represent one-year's worth of McBride's compensation package at Market Street. Obviously, the parties believed one year would be a reasonable time for McBride to obtain new employment. We cannot say the "Termination Payments" bear no reasonable relation to any probable actual damage McBride would suffer.[20]

It may appear unfair to limit McBride to one year's salary and benefits when he was terminated within the first year of his three-year employment term. Most likely, allowing McBride to recover breach of contract damages (even considering his mitigation of those damages by obtaining new employment) would result in a larger recovery. However, it only seems unfair due to the timing of the termination. Had the reduction in salary and subsequent termination for cause occurred three months before the end of the three-year employment term, allowing McBride the "Termination Payments" would appear to be a windfall.[21] But (absent a claim of unconscionability) it is not our

---

[20] The district court determined Section 3.4 was not a liquidated damages provision because it only accounted for some breaches of the Agreement. But a liquidated damages provision need not apply to all breaches. *See Fortune Bridge Co. v. Dep't of Transp.*, 250 S.E.2d 401, 402 (Ga. 1978).

[21] Another benefit to the "Termination Payments" provision is that McBride has

responsibility to measure fairness. We are bound by the terms of the parties' Agreement:

> Another feature implicit in the concept of liquidated damages . . . is that *both parties are bound by their agreement*. A non-breaching party who has agreed to accept liquidated damages *cannot elect after a breach to take actual damages should they prove greater than the sum specified*. The breaching party cannot complain that the actual damages are less than those specified as liquidated damages. The liquidated damages become the maximum as well as the minimum sum that can be collected.

*S.E. Land Fund, Inc.*, 227 S.E.2d at 343 (citations and quotations omitted) (emphasis added); *see also Jefferson Randolph Corp. v. Progressive Data Sys., Inc.*, 553 S.E.2d 304, 308 (Ga. Ct. App. 2001) (stating that "[i]f liquidated damages are recoverable, then the parties *cannot* elect between liquidated and actual damages") (emphasis added), *rev'd on other grounds*, 568 S.E.2d 474 (Ga. 2002). Here, McBride elected to terminate the Agreement for cause upon receiving a reduction in his Annual Base Salary, which entitled him to the liquidated damages provided by Section 3.4.

> b) *Change in the Terms of Net Contribution Incentive*

McBride was only entitled to the net contribution incentive if the Western Division was profitable. The evidence demonstrated the Western Division was not profitable in 2005. It also showed that at the time of trial in December 2006, it was unknown whether the Western Division would be profitable for 2006 because the year-end numbers would not be determined until early 2007. No evidence projected the Western Division's profitability for 2007. Thus, McBride failed to show he suffered any

---

no duty to mitigate them. *See Royal Crown Cos. v. McMahon,* 359 S.E.2d 379, 382 (Ga. Ct. App. 1987) ("Because under the contract plaintiff's right to severance pay was absolute . . . we find no merit in Royal Crown's additional argument that plaintiff's damages should have been reduced under the 'mitigation theory.'") (quotations omitted).

- 29 -

actual damage as a result of Market Street changing the terms of his net contribution incentive compensation. McBride was entitled to at most nominal damages as a result of this breach. *See Belcher v. Thomson Newspapers, Inc.,* 379 S.E.2d 204, 205 (Ga. Ct. App. 1989) ("'In every case of breach of contract the injured party has a right to damages, but if there has been no actual damage, the injured party may recover nominal damages sufficient to cover the costs of bringing the action.'") (quoting Ga. Code. Ann. § 13-6-6).

Contrary to McBride's arguments to the jury and this Court, he is not entitled to his compensation and benefits for the remaining term of the Agreement (reduced by any mitigation) or his $474,000 contingent signing bonus as a result of Market Street changing the terms of his net contribution incentive. An injured party is entitled to recover only the "compensatory damages that he suffered by reason of the breach of his contract; in other words, . . . the proper measure of damages arising from [a] breach of [a] contract of employment [is the] actual loss sustained by the breach, and not the gross amount of wages and expenses under the contract." *Rodgers v. Georgia Tech Athletic Ass'n,* 303 S.E.2d 467, 472 (Ga. Ct. App. 1983) (quotations omitted). McBride's damages are limited to those caused by the alleged breach, *i.e.*, the net contribution incentive he would have earned had Market Street not changed the terms. He failed to prove he would have earned any incentive even had the terms not been changed, as earning that incentive was always conditioned upon the Western Division being profitable. As explained above, he failed to prove profitability.

*c)*     *Failure to Pay the "Termination Payments"*

As a matter of law, the only damages arising from Market Street's failure to pay McBride the "Termination Payments" are the payments themselves. *See Bauer*, 527 S.E.2d at 244-45. Those payments total $242,000. The fact Market Street did not immediately remit that amount to McBride upon his termination for cause is compensated by the payment of interest. Under Georgia law, prejudgment interest may be awarded when a plaintiff seeks a liquidated sum.[22] *See* Ga. Code. Ann. § 7-4-15 ("All liquidated demands, where by agreement or otherwise the sum to be paid is fixed or certain, bear interest from the time the party shall become liable and bound to pay them; if payable on demand, they shall bear interest from the time of the demand."). Here, the district court awarded post-judgment interest under 28 U.S.C. § 1961 but not pre-judgment interest.[23] Given our determination above that McBride's damages for a reduction in his Annual Base Salary are a liquidated amount and because he requested an award of "interest on the unpaid liquidated damages and severance benefits" in his complaint, on remand the district court should award pre-judgment interest. (R. Vol. I at 20.)

*d)*     *Summary of Breach of Contract Damages*

McBride is entitled, as a matter of law, to the "Termination Payments" ($242,000)

---

[22] Here, Market Street contests McBride's entitlement to damages but concedes $242,000 is the correct amount.

[23] "A federal court sitting in diversity applies state law, not federal law, regarding the issue of prejudgment interest." *See Strickland Tower Maint., Inc. v. AT & T Commc'ns, Inc.*, 128 F.3d 1422, 1429 (10th Cir. 1997). "But even in cases founded on diversity jurisdiction, the post-judgment interest rate on a federal court judgment is established by federal law, not state law." *In re Riebesell*, 586 F.3d 782, 794 n.11 (10th Cir. 2009).

plus pre-judgment interest as a result of the reduction in his salary and failure to timely remit those payments. However, because McBride is entitled to receive the "Termination Payments" on the termination for cause claim, he is not entitled to receive them again under the breach of contract claim. *See Ga. Ne. R.R., Inc., v. Lusk*, 587 S.E.2d 643, 644 (Ga. 2003) ("Georgia, as part of its common law and public policy, has always prohibited a plaintiff from a double recovery of damages; the plaintiff is entitled to only one recovery and satisfaction of damages, because such recovery and satisfaction is deemed to make the plaintiff whole."). Nor is he entitled to receive more for the reduction in his salary (*i.e.*, his actual damages) than that provided for by the liquidated damages clause. *See S.E. Land Fund, Inc*., 227 S.E.2d at 343 ("A non-breaching party who has agreed to accept liquidated damages cannot elect after a breach to take actual damages should they prove greater than the sum specified.").

With regard to the change in the terms of the net contribution incentive, McBride is only entitled to an award of nominal damages as there was no evidence of actual damages.

## V. CONCLUSION

We **AFFIRM** the jury's liability verdicts as well as the district court's entry of a declaratory judgment. However, we **REVERSE** the damages awards and **REMAND** to

the district court to enter a damages award of $242,000 plus any pre-and post-judgment interest to which he may be entitled.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge